**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ARGELIS ORTEGA and AISHA WILSON SMITH, individually and on behalf of all others similarly situated, | ) ) ) |
| | ) **Case No.:** |
| Plaintiffs, | ) |
| | ) |
| v. | ) **CLASS ACTION COMPLAINT** |
| | ) |
| HOLY NAME MEDICAL CENTER, INC. | ) **JURY TRIAL DEMANDED** |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

**CLASS ACTION COMPLAINT**

Plaintiffs Argelis Ortega and Aisha Wilson Smith ("Plaintiffs"), individually and on behalf of all others similarly situated, through the undersigned counsel, hereby alleges the following against Defendant Holy Name Medical Center, Inc. ("Holy Name" or "Defendant"). Facts pertaining to Plaintiffs and their personal experiences and circumstances are alleged based upon personal knowledge and all other facts herein are alleged based upon information and belief, *inter alia*, the investigation of Plaintiffs' counsel.

**NATURE OF THE ACTION**

1.      This is a privacy class action arising from Defendant Holy Name's unlawful interception and disclosure of its patients' and website users' confidential communications through third-party tracking technologies embedded on its website, https://www.holyname.org (the "Website").

2.      Through its Website, Defendant invites patients and prospective patients to, among other things, search for medical conditions, identify healthcare providers, schedule medical

appointments, pay medical bills, and access patient services, thereby encouraging users to communicate highly sensitive health-related information.

3.    Plaintiffs and Class Members provided this information to Defendant with the reasonable expectation that Defendant, as a healthcare provider, would not share their sensitive health information without their consent.

4.    Unbeknownst to users, Defendant uses tracking technologies on its Website— including Google Analytics, Google DoubleClick ("DoubleClick"), Microsoft Clarity ("Clarity"), Microsoft Bing Universal Event Tracking ("Bing UET"), The Trade Desk ID, Pinterest Tag, and related advertising and analytics technologies—that intercept users' electronic communications in real time and transmit the contents of those communications to third parties.

5.    Defendant's conduct is not accidental. Rather, Defendant knowingly implemented these tracking technologies to monitor users' interactions with its Website and to disclose those interactions to third parties for analytics, marketing, and monetization purposes. These disclosures increase the value of Defendant's digital assets, including its Website, by enabling third parties to build detailed user profiles to help them target individuals with advertising for commercial gain.

6.    The interception of the user's sensitive and private communications is imperceptible to the average consumer's "naked eye" and occurs contemporaneously with the user's use of the Website. The tracking code embedded on Defendant's Website captures and transmits user communications to third parties at the same time those communications are sent to Defendant.

7.    The user communications intercepted and disclosed by Defendant include, without limitation: users' searches about medical conditions, medical providers, medical services, and user

information relating to billing and payment for medical services and doctor visits, medical records, and patient portal access, all of which reflect users' private, protected health information.

8. Defendant discloses this protected health information to third-parties by coupling it with persistent identifiers that enable third parties to associate the communications with specific individuals.

9. These disclosures are not incidental nor are they related to the provision of health care. Third parties use this highly sensitive and user-specific information to build and profit from detailed user profiles, enable targeted advertising, and improve analytics--all while Defendant benefits from increased marketing insight, engagement, and the enhanced value of its digital infrastructure.

10. Defendant does not disclose that, upon receipt, users' private health information will be transmitted to third parties for marketing and analytics purposes, nor does Defendant obtain users' consent to do so.

11. Defendant's conduct is ongoing and affects thousands of users like Plaintiffs and others similarly situated who have visited Defendant's Website from New Jersey and across the United States.

12. As a result of Defendant's conduct, Plaintiffs and Class Members have suffered injury, including the invasion of their privacy, the unauthorized interception and disclosure of their confidential communications and sensitive health-related information, and the loss of control over their sensitive health-related information.

13. Accordingly, Plaintiffs asserts claims for violations of the Electronic Communications Privacy Act and the New Jersey Wiretapping and Electronic Surveillance

Control Act, and seeks damages, declaratory and injunctive relief based on Defendant's unlawful disclosure of protected health information, and all other relief permitted by law.

## PARTIES

### A.     Plaintiffs

#### Argelis Ortega

14.     Plaintiff Argelis Ortega ("Plaintiff Ortega") is a resident and citizen of New Jersey and has been Defendant's patient for many years. Plaintiff Ortega has used Defendant's Website numerous times, including on her mobile device, to access the health services offered by Defendant.

15.     Among other things, Plaintiff Ortega used the Website to search for healthcare providers, search for medical services, schedule appointments, pay medical bills, and access Defendant's patient portal and other patient-facing services.

16.     Plaintiff Ortega used Defendant's Website to search for healthcare providers and medical services, including searches relating to cardiology and physician care. Plaintiff Ortega also used the Website to locate providers and healthcare-related resources associated with Defendant.

17.     Plaintiff Ortega accessed Defendant's Website on multiple occasions over the past couple years, including as recently as February 2026, using an Android mobile device and the Google Chrome browser.

18.     While interacting with the Website, Plaintiff Ortega transmitted electronic communications reflecting her private, sensitive healthcare needs and treatment.

19.    Defendant intercepted and disclosed Plaintiff Ortega's private healthcare-related communications and personal identifying information to third parties through embedded tracking technologies without Plaintiff Ortega's knowledge or informed consent.

20.    Plaintiff Ortega reasonably believed that her interactions with Defendant's Website, including her searches for healthcare providers, searches for medical services, appointment scheduling, payment of medical bills, and patient portal activities, would remain private and confidential and would not be disclosed to advertising companies, analytics providers, data brokers, or other third parties.

**Aisha Wilson Smith**

21.    Plaintiff Aisha Wilson Smith ("Plaintiff Smith") is a resident and citizen of New Jersey and has been Defendant's patient for many years. Plaintiff Smith has used Defendant's Website numerous times, including on her mobile device, to access the health services offered by Defendant.

22.    Among other things, Plaintiff Smith used the Website to search for healthcare providers, search for medical services, schedule appointments, pay medical bills, and access Defendant's other patient-facing services.

23.    Plaintiff Smith used Defendant's Website to search for healthcare providers, medical specialties, and healthcare services, including information relating to ear, nose, and throat ("ENT") care and gastroenterology services. Plaintiff Smith also used the Website to identify physicians, evaluate treatment options, and access healthcare-related information and resources offered by Defendant.

24.    Plaintiff Smith accessed Defendant's Website on multiple occasions over the past several years, including as recently as May 2026, using her laptop computer and iPhone through the Google Chrome web browser.

25.    While interacting with the Website, Plaintiff Smith transmitted electronic communications reflecting her private, sensitive healthcare needs and treatment.

26.    Defendant intercepted and disclosed Plaintiff Smith's private healthcare-related communications and personal identifying information to third parties through embedded tracking technologies without Plaintiff Smith's knowledge or informed consent.

27.    Plaintiff Smith reasonably believed that her interactions with Defendant's Website, including her searches for healthcare providers, medical services, appointment scheduling, billing functions, and patient portal activities, would remain private and confidential and would not be disclosed to advertising companies, analytics providers, data brokers, or other third parties.

**B.    Defendant**

28.    Defendant Holy Name Medical Center, Inc. ("Holy Name" or "Defendant") is a nonprofit healthcare provider headquartered in Teaneck, New Jersey.

29.    Holy Name operates a large integrated healthcare system that includes a 361-bed acute care hospital, specialty treatment centers, a cancer center, a fitness center, a residential hospice, a nursing school, and an affiliated physician network serving patients throughout New Jersey and the United States.

30.    Holy Name provides a broad range of healthcare services, including inpatient and outpatient care, specialty treatment, rehabilitation services, diagnostic services, wellness programs, educational services, and patient support services.

6

31.    Holy Name holds itself out as a trusted healthcare provider and collects, maintains, and processes highly sensitive personal and medical information in connection with the healthcare services it provides to patients and prospective patients.

32.    In addition to its physical healthcare facilities, Holy Name operates an extensive online presence through its publicly accessible Website, which serves as a primary point of interaction between Defendant and its patients and prospective patients.

33.    Through the Website, Holy Name enables users to search for physicians and medical providers, research medical conditions and treatment options, locate healthcare facilities, access patient portal services, pay medical bills, request appointments, and obtain healthcare-related information and resources.

34.    Holy Name designed, implemented, maintained, and controlled the operation of the Website, and intentionally embedded the third-party tracking technologies onto the Website that intercept and disclose users' communications and identifying information to third parties.

35.    Upon information and belief, Holy Name embedded and deployed tracking technologies on the Website, including technologies associated with Google Microsoft, The Trade Desk, Xandr/AppNexus, and Pinterest.

36.    At all relevant times, Holy Name was responsible for the collection, use, storage, disclosure, and transmission of information communicated through the Website, including the electronic communications and protected health information of Plaintiffs and Class Members.

**JURISDICTION AND VENUE**

37.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.

38.    The Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District and Defendant operates its Website from this District. The acts and omissions giving rise to Plaintiffs' claim occurred in and emanated from this District.

39.    This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because Plaintiffs' state-law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

40.    This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendant.

41.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant maintains its principal place of business in this District and therefore resides in this District pursuant to 28 U.S.C. § 1391(c)(2). Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' and Class Members' claims occurred in this District. The Website is accessible to and used by users throughout the District, and the tracking conduct at issue, is deployed from Defendant's centralized Website operated from this District. Plaintiffs reside in this District. Defendant's tracking conduct is nationwide in scope and emanates from its centralized Website, which is operated from and maintained in this District.

**BACKGROUND ON PIXEL TRACKING**

42.    Third-party tracking technologies-commonly referred to as "pixels" can be embedded into websites to track user activity and data. These technologies, developed and operated by companies such as Google, Meta, and Microsoft are designed to monitor and record

8

user behavior, collect detailed information about user website interactions, and transmit that information to third parties for analytics and/or commercial advertising purposes.

43. The term "pixel" refers to a code embedded in a website's design that tracks when a user visits the site or interacts with specific pages. When triggered, the pixel causes the web browser to transmit data about the website's user activity to a third party. This transmission occurs in real time and can include both information that can be used to identify a particular user-such as IP addresses, cookies, and device identifiers-and the substance of the user's interaction with the website, including the pages viewed, buttons clicked, and text-box information entered into forms or search bars.

44. Because these transmissions occur contemporaneously with the user's interaction with the website, the tracking technologies capture and transmit the contents of users' electronic communications at the time those interactions and communications are made.

45. These pixel trackers function as part of a broader data aggregation ecosystem in which multiple entities collect, share, and combine user data across platforms. Through processes commonly referred to as "identity resolution," third parties match fragmented identifiers such as cookies, device IDs, and browsing activity to create a robust collection of individual-specific user profiles.

46. This process enables third parties to link a user's interactions on one website with that same user's activity across other websites, applications, and devices, thereby allowing those entities to associate identifiable individuals with sensitive personal information and to build detailed profiles reflecting those individuals' interests.

47. Third parties use this kind of detailed, individualized user data to enable targeted advertising, develop analytics, and increase the commercial value of digital advertising systems.

These uses have no relation to healthcare but rather create financial incentives for the continued collection, sharing, and ultimately the commercial exploitation of users' sensitive data.

## FACTUAL ALLEGATIONS

**Tracking Technologies Used By Defendant's Website**

48.    Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms, generating over $200 billion in annual revenue primarily through targeted advertising services. Google's business model depends on collecting vast amounts of user data across its numerous products and services, which it then leverages to deliver targeted advertisements.

49.    The Google Analytics 4 Tracker ("Google Analytics Tracker") is a web analytics service offered by Google that allows website owners to track visitors' actions on their website in order to gain insights into user behavior and to target them with personalized advertisements. Holy Name has implemented the Google Analytics Tracker on its Website.

50.    The Google Analytics Tracker is a JavaScript-based tracking technology. Website owners implement the tracker by adding a snippet of JavaScript code to their website's source code. Once implemented, the tracker loads automatically and immediately whenever a user visits a page containing the tracker's source code. The tracking code executes in the background without any visible indication to the user, making it completely invisible to ordinary website visitors.

51.    The Google Analytics Tracker intercepts and collects various data points about user interactions with a website and transmits details of these interactions to Google. Along with these events, the Google Analytics Tracker transmits unique identifying cookies, including the 3PSID, 3PAPISID, 3PSIDCC, and NID cookies. The 3PSID, 3PAPISID, and 3PSIDCC cookies allow Google to identify users who are signed into their Google accounts (e.g., Gmail or Chrome),

thereby linking browsing activity on third-party websites to an authenticated Google identity. The NID cookie, by contrast, collects information from users even when they are not signed into a Google account, including users who have never authenticated or are logged out, enabling tracking regardless of authentication status. These cookies enable Google to create comprehensive user profiles and are third-party marketing cookies, meaning the information does not stay within the site but is sent to Google itself. These cookies can constitute personally identifiable information ("PII") as they are unique to each user and may be used to identify individuals.

52.     DoubleClick is an advertising tracking tool owned by Google and designed to collect information about user behavior on websites in order to improve the targeting and effectiveness of advertising campaigns. Holy Name has implemented the DoubleClick tracker on its Website.

53.     Through the DoubleClick Tracker, Google creates and assigns unique identifiers to website visitors, including through the IDE and DSID cookies. The IDE cookie is a persistent advertising identifier used to build user profiles for cross-site ad targeting and to measure advertising effectiveness by tracking actions users take after viewing or clicking on advertisements. The DSID cookie is an account-linked identifier that is set when a user is logged into a Google account; it links browsing activity on non-Google websites to the user's Google account and ensures that the user's ad personalization settings are applied across non-Google sites. Google's own documentation confirms that DoubleClick collects and stores IP addresses in server logs, along with cookies that uniquely identify browsers. [1] Accordingly, the IDE and DISD

---

[1] *See* Google Privacy & Terms, https://policies.google.com/technologies/ads?hl=en-US, (last visited June 18, 2026).

cookies, along with the user's IP address, can constitute PII as they are unique to each user and may be used to identify individuals.

54.    The Trade Desk is a digital advertising technology company that provides data-driven advertising and audience targeting services. Through domains such as insight.adsrvr.org. When a user visits a website using The Trade Desk services, the website includes a piece of code provided by the Trade Desk, typically in the form of a JavaScript tag. This code allows the website to communicate with The Trade Desk's platform. Upon loading the webpage, the code provided by The Trade Desk may trigger a request to The Trade Desk's servers, adsrvr.org. The Trade Desk's servers handle the request and may set a tracking cookie in the user's browser known as The Trade Desk ID ("TDID"). The TDID is a persistent, unique identifier that functions like a digital fingerprint, enabling the Trade Desk to track users across different websites, devices, and browsing sessions.

55.    In addition to TDID, The Trade Desk also collects IP addresses, which provide geolocation data. By combining IP addresses with TDID cookies, the platform can not only pinpoint a user's geographic location but also distinguish between multiple people using the same household or workplace network and even map behavioral patterns as individuals move between home, work, and other locations. Accordingly, the TDID cookie, along with the user's IP address, can constitute PII as they are unique to each user and may be used to identify individuals

56.    The Trade Desk receives information regarding users' interactions with websites and uses that information to facilitate audience segmentation, behavioral advertising, analytics, and profile development. Information transmitted to The Trade Desk may be combined with data collected from other sources to identify and target users across websites, devices, and platforms.

12

This enables advertisers to create granular audience profiles and deliver ads that are tailored to a person's inferred health status, interests, and digital footprint.

57.     Upon information and belief, Defendant's Website also communicated with services associated with Xandr (formerly AppNexus), a digital advertising platform that facilitates identifier synchronization and audience matching among advertising technology providers. When a user visits the Website, Xandr's "uuid2" cookie is transmitted to and embedded in the user's browser. The uuid2 cookie contains a unique randomly generated value that enables Xandr to distinguish browsers/devices and to support ad selection and measurement. Xandr uses the uuid2 cookie to perform user synchronizations with its partners, which on information and belief include Google and Microsoft, and their identifiers and cookies. Through these processes, persistent identifiers, IP addresses, and other information may be shared and matched across platforms, enabling third parties to associate Website activity with particular users, devices, or browser profiles.

58.     Microsoft is a multinational technology company headquartered in Redmond, Washington. Microsoft's business model depends on collecting vast amounts of user data across its numerous products and services, which it then leverages to deliver targeted advertisements. Microsoft collects user data through services such as Clarity and Bing UET. These services help website owners understand user behavior, improve site functionality, and support personalized advertising. Clarity focuses on analytics and user interaction insights, while Bing UET is connected to Microsoft's search and advertising network. Both Clarity and Bing UET use tracking technologies to gather information that can be used for analysis and targeted ads.

59.     When a user visits a website that uses Clarity or Bing UET, information about their actions on the site, such as which pages they view, where they click, and how they scroll is

automatically sent to Microsoft. This data is sent along with a special browser cookie called the Microsoft User ID ("MUID"). Microsoft uses the MUID cookie by placing it on a user's browser and collecting information about the user, which is later used for targeted advertising. Microsoft's Privacy Policy[2] further clarifies that it collects data directly from users, from interactions with Microsoft products, and from affiliates, subsidiaries, and third parties, and that it may combine this data across different contexts to deliver more personalized experiences. Thus, the MUID cookie acts like a digital tag that helps Microsoft recognize the same user across different and unrelated websites that also use Microsoft tracking technologies. Bing UET relies on the MUID cookie as a core identifier to link user interactions with analytics and advertising data across Microsoft's ecosystem.

60.    The MUID cookie also contains a globally unique identifier assigned to the user's browser, and/or an ID assigned to a user as long as the user is authenticated through their Microsoft account.[3] Bing UET collects both behavioral data and technical identifiers, including the user's IP address and the MUID cookie. The MUID cookie contains a unique browser identifier or, when applicable, an ID associated with the user's Microsoft account. Thus, the MUID cookie acts like a digital tag that helps Microsoft recognize the same user across different and unrelated websites that also use Microsoft tracking technologies.

61.    Both Clarity and Bing UET rely on the MUID cookie as a core identifier to link user interactions with analytics and advertising data across Microsoft's ecosystem. The MUID cookie serves as a persistent browser-level identifier that Microsoft uses to recognize and follow

---

[2] https://www.microsoft.com/en-us/privacy/privacystatement.
[3] https://help.ads.microsoft.com/#apex/ads/en/53056/2:~:text=UET%20collects%20the,their%20Mic rosoft%20account

14

users across different sites and services, enabling it to consolidate activity into unified behavioral profiles. Because the MUID cookie uniquely identifies users, it constitutes personally identifiable information.

62.    Pinterest is a social media company headquartered in San Francisco, CA. It operates a social media platform designed to help users find and save ideas such as recipes and home décor. Pinterest uses its online tracking tool, Pinterest Taf, to monitor and analyze user interactions on a website. Pinterest Tag is a tracking technology that allows website operators to monitor user activity and share information with Pinterest for advertising and analytics purposes. Through domains such as ct.pinterest.com, Pinterest receives information regarding users' interactions with websites, enabling the creation of audience segments, advertising attribution, and targeted advertising campaigns. Pinterest may combine this information with information obtained from other sources to develop profiles reflecting users' interests, activities, and characteristics. By linking data to individual users, Pinterest helps website operators measure ad effectiveness and track user interactions. This data is transmitted to Pinterest in real-time, where it is stored and processed.

63.    The Pinterest Tag works alongside cookies stored in a visitor's browser. These cookies allow the Tag to recognize when someone visits a website after engaging with content on Pinterest. This recognition enables the measurement of conversions and optimization of marketing efforts. When a user visits a website with Pinterest Tag before signing into their Pinterest account in the browser, an HTTP request is sent which includes information about the user's actions on the website, along with the _pinterest_ct_ua cookie, used to group user actions across domains for users who cannot be identified by Pinterest, and the _pinterest_sess cookie which manages a user's login state within a web browser.

15

64.    Once the user has signed into Pinterest (even if the user subsequently logs out), a new HTTP request is generated containing additional cookies. These cookies, which are persistent for one year, include data that differentiate users from one another and can be used to link the data collected to the user's Pinterest profile. The _Secure-s_a cookie contains secure session information to manage user interactions, and the _pinterest_ct_rt `cookie contains a user ID and the timestamp of its creation.

65.    Upon information and belief, the third-party tracking technologies embedded on Defendant's Website, including Google Analytics, DoubleClick, The Trade Desk, Clarity, Bing UET, and Pinterest Tag, operate as part of a broader advertising and data-sharing ecosystem. Through processes commonly referred to as identity resolution, cookie syncing, audience matching, and profile enrichment, these entities synchronize identifiers and exchange information in order to associate Website activity with specific users, devices, or browser profiles. These practices enable third parties to aggregate information concerning users' healthcare-related activities and incorporate that information into detailed consumer profiles used for analytics, audience targeting, advertising, and other commercial purposes.

**Defendant's Website Encourages Users to Provide Sensitive Health Information**

66.    Defendant Holy Name operates a comprehensive healthcare website through which patients and prospective patients can search for physicians and medical providers, explore healthcare services and treatment options, locate healthcare facilities, access billing and payment services, request appointments, access patient portal services, and obtain healthcare-related information and resources. The Website includes pages and features relating to specialized medical services, including cardiology, cancer care, diagnostic services, and other healthcare-related treatment areas.

16

67.    Plaintiffs and others similarly situated use Defendant's Website to communicate highly sensitive information concerning their health conditions, treatment needs, healthcare interests, and status as patients. For example, when a user searches for a cardiologist or other specialist using Defendant's provider-search features, that search communicates the user's interest in obtaining treatment relating to a particular medical condition or healthcare concern. Likewise, when a user searches for medical conditions, treatment options, cancer care services, or other specialized healthcare services, the search itself conveys sensitive health-related information concerning the type of care the user is seeking. Plaintiffs, for example, used Defendant's Website to search for healthcare providers, cardiology-related care, medical services, and other healthcare-related information and resources. Similarly, when users access pages relating to billing, appointment scheduling, cancer care, patient portal services, or other patient-facing resources, those users identify themselves as patients or prospective patients and engage in activities directly tied to their healthcare.



17

**Figure 1.** Holy Name Website search function relating to healthcare providers and medical services.

68. These interactions constitute electronic communications between the user and Defendant's Website. Users reasonably expect that such communications, particularly those revealing sensitive health-related information, treatment interests, provider searches, patient status, or healthcare-related activities, will remain private and confidential and will be used solely for purposes of obtaining healthcare services and information from Defendant.

**Defendant Uses Tracking Technologies to Capture and Disclose User Information**

69. Unbeknownst to users, Defendant has embedded third-party tracking technologies throughout its website. These technologies include, but are not limited to, Google Analytics, DoubleClick, Clarity, Bing UET, The Trade Desk, Pinterest Tag, and related advertising and analytics technologies.

70. These tracking tools are not passive or incidental features. Rather, they are deliberately implemented pieces of code designed to monitor user activity and transmit data to third parties. When a user visits Defendant's website, the tracking code automatically executes within the user's browser. As part of this process, the user's browser sends requests to third-party servers controlled by entities such as Google.

71. Defendant knowingly deployed these tracking technologies on webpages that users would foreseeably access to obtain information regarding medical conditions, treatment options, healthcare providers, billing matters, and patient services, despite the inherently sensitive and confidential nature of such interactions.

72. These requests include detailed information about users' interactions with the Website. The information transmitted includes the contents of users' communications, including

18

the specific pages visited, the sequence of user actions, and the content of user searches, all of which reflect the substance and meaning of users' interactions with the Website. The transmissions further include persistent identifiers, such as cookies, universally unique identifiers (UUIDs), device identifiers, and IP addresses, which enable third parties to associate the intercepted communications with particular individuals or devices.



**Figure 2.** Browser network request from Defendant's Website transmitting user interaction data and persistent identifiers to third-party tracking services during a user's visit to the patient portal.



**Figure 3.** Browser network request from Defendant's Website transmitting user interaction data and persistent identifiers, including a UUID, to Google.



**Figure 4.** User's search on Browser network for Cardiologist transmitted to DoubleClick.

20

**Defendant's Interception and Transmission of Sensitive User Communications**

73.    The operation of the tracking technologies described in this Complaint results in the interception of users' communications with Defendant's website. Each time a user interacts with the site, the tracking code captures the substance of that interaction and transmits it to third parties in real time. The information transmitted includes the contents of users' communications, in that it reflects the substance, meaning, and context of users' interactions with the Website.

74.    For example, when a user searches for a medical specialty or condition using the Website's "Find a Doctor" feature, the search term—such as "psychiatry"—is transmitted to third parties, including Google, Microsoft, The Trade Desk, and Pinterest, along with identifying information about the user. Similarly, when a user views a specific physician's profile page, the identity of that physician and the fact that the user viewed that page are transmitted to third parties. Plaintiffs likewise used Defendant's Website to search for specific physicians and medical specialists, including providers specializing in ENT care and gastroenterology. Upon information and belief, those searches and related interactions with Defendant's Website were transmitted to third parties together with persistent identifiers and other identifying information. *See* Figures 4 and 15.

75.    The same is true when users navigate to pages associated with patient services on Defendant's website. When a user accesses pages related to billing and payment,  medical records requests, or Defendant's patient portal features, those interactions are captured and transmitted to third parties. These interactions indicate that the user is an existing patient or is actively seeking medical care and reveal the nature of the user's engagement with Defendant's healthcare services.



**Figure 5**. User's "Pay Your Bill" view on the Website is transmitted to Google along with identifying cookies.



22

**Figure 6.** User's "Pay Your Bill" view on the Website is transmitted to DoubleClick along with identifying cookies.



**Figure 7.** User's "Pay Your Bill" view on the Website is transmitted to Microsoft along with identifying cookies.



**Figure 8.** User's "Pay Your Bill" view on the Website is transmitted to The Trade Desk along with identifying cookies.



**Figure 9.** User's "Pay Your Bill" view on the Website is transmitted to Pinterest along with identifying cookies.



**Figure 10.** User's "Patient Portal" view on the Website is transmitted to Google along with identifying cookies.



**Figure 11.** User's "Patient Portal" view on the Website is transmitted to DoubleClick along with identifying cookies.



**Figure 12.** User's "Patient Portal" view on the Website is transmitted to Microsoft along with identifying cookies.



**Figure 13.** User's "Patient Portal" view on the Website is transmitted to The Trade Desk along with identifying cookies.



**Figure 14.** User's "Patient Portal" view on the Website is transmitted to Pinterest along with identifying cookies.

76.    Plaintiffs used the Website to, among other things, pay medical bills and their sensitive health-related information was thereby captured by the third-party trackers embedded on the Website. *See, e.g.*, Figures 5-9.

77.    Users researching medical conditions using Defendant's Website likewise communicate highly sensitive health-related information to Defendant, which is then transmitted to third parties, including Google, Microsoft, The Trade Desk, and Pinterest. For instance, a search for "cardiology" using Defendant's Website results in the transmission of that search term, along with identifying information, to entities such as Google. The search itself reflects information concerning the user's present or suspected medical condition and the type of healthcare services the user is seeking.



**Figure 15**. Holy Name's Website search results for "cardiology."

78.     In addition, when users select services such as cancer treatment or other specialized care, those selections are communicated to third parties. Even actions such as clicking on directions to a facility or using a "Book Online" feature for medical appointments can result in the transmission of data reflecting the user's intent to seek medical care.

79.     These transmissions occur contemporaneously with the user's interaction with the website and are initiated by the tracking code embedded by Defendant. As such, they constitute interceptions of electronic communications within the meaning of federal and state wiretap laws.

**More than Mere Data Collection: Defendant's Trackers Permit User Identity Resolution, Data Linking, and Multi-Party Sharing**

80.     The third-party tracking technologies described in this Complaint and deployed on Defendant's Website do not merely collect isolated data points. Rather, they operate as part of a broader data aggregation ecosystem in which multiple entities synchronize identifiers and combine

user data. Through identity resolution processes, third parties match cookies, device identifiers, and browsing activity to create unified profiles of individual users.

81.    These processes enable third parties, including Google, Microsoft, The Trade Desk, and Pinterest, to associate users' interactions with Defendant's Website, including their health-related searches and activities, with specific individuals or devices and with those users' broader online behavior. As a result, third parties can link identifiable individuals to particular medical conditions, treatment interests, and healthcare-related activities, and incorporate that information into detailed user profiles.

82.    The tracking technologies further facilitate the sharing and synchronization of data among multiple third parties, allowing user data to be disseminated across a network of entities and integrated into broader datasets used for analytics, profiling, and targeted commercial advertising.

**Defendant's Use of Tracking Technologies Amounts to Disclosure of Protected Health Information**

83.    The information transmitted by Defendant to third parties includes data that qualifies as protected health information ("PHI"). Defendant is a healthcare provider and a covered entity under HIPAA.[4]  The information users communicate through the website relates directly to their health conditions, treatment needs, and interactions with healthcare services.

84.    When this information is combined with persistent identifiers such as cookies, device identifiers, and IP addresses, it constitutes individually identifiable health information because it can be used to identify, or provide a reasonable basis to identify, the individual to whom the information pertains.

---

[4] *See* 45 C.F.R. §§ 160.102, 160.103.

85. Third parties receiving this data, including Google, Microsoft, The Trade Desk, and Pinterest, are able to associate specific health-related interactions with particular users or devices. This allows those third parties to build detailed profiles of individuals, including their medical interests, conditions, and healthcare activities.

86. The disclosures are not limited to isolated data points. Rather, Defendant transmits a continuous stream of information reflecting users' interactions with the website, including the pages visited, searches conducted, and actions taken. See Figures 2-15. This data enables third parties to reconstruct users' healthcare related activities and infer sensitive medical information about the user.

87. The disclosure of user data through these tracking technologies is not incidental. Third parties use the transmitted information to build and enhance user profiles, enable targeted advertising, improve analytics, and increase the value of digital advertising inventory.

88. By deploying these tracking technologies, Defendant benefits from analytics, marketing insights, and increased engagement, while third parties profit from the ability to target users based on the unauthorized disclosure of their personal and sensitive health information.

**Lack of User Consent and Reasonable Expectations of Privacy**

89. At no point does Defendant obtain meaningful consent from users to intercept and disclose their communications in this manner. Users are not informed that their interactions with the Website—including searches for medical conditions, healthcare providers, patient portal activities, appointment scheduling, medical billing functions, and other healthcare-related activities—will be transmitted to third parties for advertising, analytics, profiling, or other commercial purposes. To the contrary, Defendant's Notice of Privacy Practices expressly acknowledges Defendant must obtain prior authorization before using or disclosing patient

information for marketing activities and communications, and further states: "No mobile information will be shared with third parties/affiliates for marketing/promotional purposes." *See* Figure 16.

3. **Uses and Disclosures with Your Authorization.**
For all other circumstances not described in section 1 above, we may only use or disclose your medical information where (1) you have signed an authorization on our authorization form or (2) such use or disclosure is consistent with the general consent that you signed upon admission. If you authorize us to use or disclose your medical information for another purpose, you may revoke your authorization in writing at any time. However, the revocation will not be effective to the extent that we have taken action in reliance on the use or disclosure allowed by the authorization. We generally must obtain your prior authorization for the following uses and disclosures of your medical information:
(i) Psychotherapy Notes (however, we may use and disclose psychotherapy notes for treatment, payment or health care operations without authorization or as otherwise permitted or required by law);
(ii) marketing activities or communications (however, we may send you communications that relate to your treatment, case management or care coordination); and
(iii) activities where we receive money in exchange for your medical information, except where related to the treatment you receive, public health, or research purposes.

4. **Mobile Information and Usage:** No mobile information will be shared with third parties/affiliates for marketing/promotional purposes. All other categories exclude text messaging originator opt-in data and consent; this information will not be shared with any third parties.

**Figure 16.** Excerpt from Defendant's Notice of Privacy Practices stating that patient information will not be shared for marketing purposes without written permission.[5]

90. Defendant's purported disclosures regarding the use of cookies or analytics tools are insufficient to establish consent. Such disclosures, if they exist at all, are buried in lengthy and inconspicuous privacy policies that users are not required to read or affirmatively accept in order to use the Website, and they do not clearly inform users that the contents of their health-related communications will be intercepted and shared with third parties.

91. A reasonable user visiting Defendant's Website would not expect that searching for a medical condition, viewing a physician, or accessing patient services would result in the disclosure of their personal health information to advertising and data analytics companies.

92. Defendant's unauthorized interception and disclosure of user's sensitive health information violates users' reasonable expectations of privacy and undermines the confidentiality that is fundamental to the lawful provision of healthcare services.

---

[5] https://www. https://www.holyname.org/policy/index.aspx.

93. Upon information and belief, Defendant has not executed HIPAA-complaint Business Associate Agreements with Google, Microsoft, The Trade Desk, Pinterest, or any other third-party advertising and analytics provider for the tracking activities described herein and has not obtained HIPAA-compliant patient authorizations necessary to permit the disclosure of Website user's sensitive health-related information to third-parties for non-treatment purposes.

**Defendant's Concealment, Tolling and Equitable Estoppel**

94. The applicable statutes of limitation have been tolled as a result of Defendant's' knowing concealment of its unauthorized interception and disclosure of user information.

95. Defendant secretively incorporated the at-issue tracking technologies into its Website and denied, in writing, its unauthorized use of user information for marketing purposes.

96. There was no reasonable way for the average Website user to discover the full scope of Defendant's conduct because Defendant failed to disclose it and even affirmatively—and incorrectly—represented that it would not ""disclose patient information for marketing purposes without written permission.

97. As a result, the applicable statutes of limitation have been tolled by operation of the discovery rule and the doctrine of continuing tort through the date of the filing of Plaintiffs' Complaint.

98. Additionally, Defendant had a duty to disclose its data collection and disclosure practices (including its HIPAA violations) but did not. As such, Defendants are estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

99. Plaintiffs bring this action individually and on behalf of all other persons similarly situated (the "Class") pursuant to Federal Rule of Civil Procedure 23.

100. Plaintiffs propose the following Class definition subject to amendment based on information obtained through discovery. Notwithstanding, at this time, Plaintiffs brings this action and seeks certification of the following Nationwide Class and New Jersey Subclass (collectively defined herein as the "Class"):

**Nationwide Class**

All persons in the United States who visited Defendant's website and whose electronic communications and/or protected health information were intercepted, collected, or disclosed to third parties through Defendant's use of tracking technologies.

**New Jersey Subclass**

All persons in New Jersey who visited Defendant's website and whose electronic communications and/or protected health information were intercepted, collected, or disclosed to third parties through Defendant's use of tracking technologies.

101. Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers, directors, agents, and employees, as well as any judicial officer presiding over this action and the members of their immediate families and judicial staff.

102. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions.

103. Numerosity-The members of the Class are so numerous that joinder of all members would be impracticable. Defendant's Website is publicly accessible and serves a large population of patients and prospective patients. On information and belief, the Class includes at least tens of thousands of individuals whose communications were intercepted and disclosed through Defendant's tracking technologies.

104. Commonality and Predominance-Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members. These common questions arise from Defendant's uniform conduct in implementing and operating tracking technologies on its Website and include, without limitation, whether Defendant's website was configured to transmit users' communications to third parties, whether such transmissions constituted interceptions of electronic communications, and whether Defendant disclosed the contents of those communications without authorization.

105. Additional common questions include whether the information transmitted by Defendant constituted the contents of communications under federal and state wiretap laws, whether the information qualifies as protected health information when combined with persistent identifiers, whether Defendant obtained valid consent from users, and whether Defendant's conduct was undertaken for unlawful or tortious purposes sufficient to satisfy the crime–tort exception.

106. These questions are capable of class-wide resolution because they depend on Defendant's common course of conduct and the uniform design and operation of its Website and tracking technologies, rather than on individualized inquiries into each Class member's circumstances.

107. Typicality-Plaintiffs' claims are typical of the claims of the Class because Plaintiffs, like all Class members, visited Defendant's Website and had their communications intercepted and disclosed to third parties as a result of Defendant's uniform implementation of tracking technologies.

108.   Plaintiffs and all Class Members were subjected to the same alleged misconduct and suffered the same type of injury, including the unauthorized interception and disclosure of their communications and the invasion of their privacy.

109.   Adequacy of Representation-Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to those of the Class and seek the same relief as other Class Members.

110.   Plaintiffs have retained counsel experienced in complex class action litigation, including privacy and data misuse cases, and is committed to prosecuting this action vigorously on behalf of the Class.

111.   Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)-Defendant has acted and refused to act on grounds generally applicable to the Class by implementing and continuing to use tracking technologies that intercept and disclose users' communications and protected health information without authorization.

112.   As a result, declaratory and injunctive relief is appropriate with respect to the Class as a whole to prevent Defendant from continuing its unlawful conduct and to require Defendant to bring its practices into compliance with applicable law.

113.   Superiority—Federal Rule of Civil Procedure 23(b)(3)-A class action is superior to other available methods for the fair and efficient adjudication of this controversy because the damages and other harm suffered by individual Class members are relatively small compared to the burden and expense of individual litigation.

114.   Absent a class action, most Class members would be unable to vindicate their rights, and Defendant would be allowed to retain the benefits of its unlawful conduct.

115. Class treatment will also avoid the risk of inconsistent or varying adjudications and will conserve judicial resources by resolving the claims of all Class members in a single proceeding.

**COUNT I**
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. § 2511)**
**(On Behalf of Plaintiffs and the Class)**

116. Plaintiffs repeat and reallege paragraphs 1-115 as if fully set forth herein.

117. The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring another person to intercept any electronic communication, as well as from intentionally disclosing the contents of such communications, unless a statutory exception applies.

118. At all relevant times, Plaintiffs and Class Members were engaged in electronic communications with Defendant through Defendant's Website, including by transmitting requests, searches, and interactions through their web browsers to Defendant's servers for the purpose of obtaining healthcare-related information and services.

119. These communications were transmitted via interstate wire and electronic networks and constituted "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

120. Defendant intentionally embedded and operated third-party tracking technologies—including but not limited to Google Analytics, DoubleClick, Clarity, Bing UET, TDID, and Pinterest Tag—that were designed to, and did in fact, intercept these electronic communications during the course of transmission.

121. Specifically, when Plaintiffs and Class Members interacted with Defendant's website, Defendant's embedded code caused their browsers to simultaneously transmit data to

36

third-party servers at the same time the communications were sent to Defendant, thereby effectuating a contemporaneous interception of those communications.

122. This interception was not incidental to the functioning of the Website, nor necessary to facilitate the routing or technical functioning of communications. Rather, it was a core and intended function of the tracking technologies, which were implemented for the purpose of capturing and transmitting user data to third parties for commercial purposes.

123. The communications intercepted by Defendant included the "contents" of electronic communications as defined by 18 U.S.C. § 2510(8), in that they conveyed information concerning the substance, purport, and meaning of Plaintiffs' and Class Members' interactions with Defendant's website.

124. These contents included, without limitation, users' searches for medical conditions and specialties, the identities of healthcare providers viewed, the services and treatments explored, and users' interactions with pages associated with patient status, such as billing, medical records, and patient portal access.

125. The intercepted communications further included full or partial URL strings and page-level data reflecting the specific healthcare-related content accessed by users, which reveal the nature and context of the users' inquiries and communications.

126. Defendant caused these communications to be transmitted together with persistent identifiers—including cookies, device identifiers, and IP addresses—that enabled third parties to associate the communications with specific individuals or devices.

127. By combining the substance of users' communications with identifying information, Defendant ensured that the intercepted communications could be attributed to particular users and incorporated into detailed user profiles maintained by third parties.

37

128. Defendant intentionally disclosed, and caused to be disclosed, the contents of these communications to third parties, including Google, Microsoft, The Trade Desk, Pinterest, and the other third-party advertising and analytics providers, at the time the communications were made.

129. Defendant knew, or was reckless in not knowing, that its use of these tracking technologies would result in the interception and disclosure of users' communications, including sensitive health-related information.

130. Defendant's interception and disclosure of these communications was not necessary to provide the services requested by users, but instead was undertaken for purposes of analytics, tracking, marketing, and monetization of user data.

131. Although Defendant was a party to the communications with Plaintiffs and Class Members, the statutory "party exception" under 18 U.S.C. § 2511(2)(d) does not apply because Defendant intercepted and disclosed the communications for the purpose of committing unlawful or tortious acts.

132. In particular, Defendant's conduct involved the unauthorized disclosure of protected health information and other highly sensitive personal data to third parties in violation of privacy laws and duties of confidentiality, including obligations imposed under HIPAA and analogous privacy principles.

133. These violations constitute independent unlawful acts separate and apart from the interception itself and therefore satisfy the crime–tort exception to the ECPA's consent provision.

134. Defendant's conduct was intentional, willful, and undertaken with knowledge that it would, and did, result in the interception and disclosure of users' confidential communications.

135. As a direct and proximate result of Defendant's violations of the ECPA, Plaintiffs and Class Members suffered injury, including the invasion of their privacy, the unauthorized

38

disclosure of their confidential communications, and the loss of control over their sensitive personal and health-related information.

136.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members are entitled to recover statutory damages, actual damages, punitive damages, attorneys' fees, and such other relief as the Court deems appropriate.

**COUNT II**
**Violation of the New Jersey Wiretapping and Electronic Surveillance Control Act**
**(N.J. Stat. § 2A:156A-1 et seq.)**
**(On Behalf of Plaintiffs and the Class)**

137.    Plaintiffs repeat and reallege paragraphs1-115 as if fully set forth herein.

138.    The New Jersey Wiretapping and Electronic Surveillance Control Act ("NJWESCA"), N.J. Stat. § 2A:156A-1 et seq., prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring another person to intercept any wire, electronic, or oral communication, as well as from disclosing the contents of such communications without authorization.

139.    At all relevant times, Plaintiffs and Class Members were engaged in electronic communications with Defendant through Defendant's website, including by transmitting requests, searches, and interactions through their web browsers in order to obtain healthcare-related information and services.

140.    These communications were transmitted through electronic systems and networks and constitute "electronic communications" within the meaning of N.J. Stat. § 2A:156A-2.

141.    Defendant intentionally designed, implemented, and operated its website in a manner that incorporated third-party tracking technologies—including Google Analytics,

DoubleClick, Clarity, Bing UET, MTDID, Pinterest Tag, and related advertising and analytics technologies—that were configured to capture and transmit user communications to third parties.

142.    By embedding these tracking technologies into its website, Defendant knowingly and intentionally caused the contemporaneous interception of Plaintiffs' and Class Members' electronic communications at the time those communications were transmitted.

143.    In addition to directly intercepting communications, Defendant procured and facilitated the interception of those communications by third parties by causing users' browsers to transmit data simultaneously to Defendant and to third-party servers.

144.    Defendant's conduct constitutes both direct interception and procurement of interception within the meaning of N.J. Stat. § 2A:156A-3.

145.    The communications intercepted by Defendant included the "contents" of those communications, as defined under N.J. Stat. § 2A:156A-2(g), because they conveyed information concerning the substance, purport, and meaning of Plaintiffs' and Class Members' interactions with Defendant's Website.

146.    These contents included, among other things, users' searches for medical conditions and specialties, the identities of healthcare providers viewed, the services and treatments explored, and users' navigation of pages associated with patient status, including billing, medical records, and patient portal access.

147.    The intercepted communications further included detailed page-level data and URL information reflecting the specific healthcare-related content accessed by users, which reveals the nature and context of the users' communications with Defendant.

148. Defendant caused these communications to be transmitted together with persistent identifiers, including cookies, device identifiers, and IP addresses, which enabled third parties to associate the communications with specific individuals or devices.

149. Defendant knowingly disclosed, and caused to be disclosed, the contents of Plaintiffs' and Class Members' communications to third parties—including Google, Microsoft, The Trade Desk, and Pinterest—at or about the same time the communications were made.

150. These disclosures were not necessary to provide healthcare services to users, but instead were undertaken for commercial purposes of analytics, tracking, advertising, and monetization of user data.

151. Defendant did not obtain prior consent from Plaintiffs or Class Members to intercept or disclose their communications, and any purported consent was neither informed nor meaningful.

152. A reasonable user would not expect that communications with a healthcare provider like Defendant—including searches for medical conditions or access to patient services—would be intercepted and disclosed to third-party advertising and analytics companies.

153. Although Defendant was a party to the communications, the statutory exception under N.J. Stat. § 2A:156A-4(d) does not apply because Defendant intercepted and disclosed the communications for the purpose of committing unlawful or tortious acts.

154. Specifically, Defendant's conduct involved the unauthorized disclosure of protected health information and other confidential personal data in violation of privacy rights and duties of confidentiality, including obligations imposed under HIPAA and New Jersey law.

155. These violations constitute independent unlawful acts separate from the interception itself and therefore satisfy the unlawful–tort exception under NJWESCA.

156.    Defendant's conduct was intentional, willful, and undertaken with knowledge that it would result in the interception and disclosure of users' confidential communications.

157.    As a direct and proximate result of Defendant's violations of NJWESCA, Plaintiffs and Class Members have suffered injury, including the invasion of their privacy, the unauthorized disclosure of their confidential communications, and the loss of control over their sensitive personal and health-related information.

158.    Pursuant to N.J. Stat. § 2A:156A-24, Plaintiffs and Class Members are entitled to recover statutory damages, actual damages, punitive damages, attorneys' fees, and such other relief as the Court deems appropriate.

## COUNT III
### Declaratory Relief
### (On Behalf of Plaintiffs and the Class)

159.    Plaintiffs repeat and reallege paragraphs 1-115 as if fully set forth herein.

160.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

161.    The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), together with its implementing regulations, establishes comprehensive standards governing the privacy and security of individuals' medical information and imposes strict limitations on the use and disclosure of protected health information by covered entities.

162.    Defendant is a healthcare provider that transmits health information in electronic form in connection with covered transactions and is therefore a "covered entity" within the meaning of 45 C.F.R. § 160.103.

42

163.    HIPAA defines "protected health information" ("PHI") as individually identifiable health information that is transmitted or maintained in any form or medium and that relates to an individual's past, present, or future physical or mental health condition, the provision of healthcare to the individual, or the payment for such care.

164.    As alleged herein, Plaintiffs and Class Members communicated information through Defendant's Website that directly relates to their health conditions, treatment interests, and healthcare activities, including searches for medical conditions, selection of healthcare providers, and access to patient-related services such as billing, medical records, and patient portal functionality.

165.    When such information is transmitted together with persistent identifiers— including cookies, device identifiers, and IP addresses—it becomes individually identifiable because it can be used to identify, or provide a reasonable basis to identify, the individual to whom the information pertains.

166.    Accordingly, the information transmitted by Defendant through its Website constitutes protected health information within the meaning of HIPAA.

167.    HIPAA and its implementing regulations prohibit covered entities from using or disclosing protected health information except as expressly permitted, including for purposes of treatment, payment, or healthcare operations, or where a valid, HIPAA-compliant authorization has been obtained from the individual.

168.    Defendant disclosed Plaintiffs' and Class Members' protected health information to third parties—including Google, Microsoft, The Trade Desk, and Pinterest—through the operation of its embedded tracking technologies.

43

169.    These disclosures occurred automatically and contemporaneously with users' interactions with Defendant's website and were not incidental to the functioning of the website, but rather were the direct and intended result of Defendant's implementation of third-party tracking tools.

170.    The disclosures at issue were not for purposes of treatment, payment, or healthcare operations, but instead were made for analytics, tracking, marketing, and other commercial purposes unrelated to the provision of healthcare.

171.    Defendant did not obtain valid, HIPAA-compliant authorizations from Plaintiffs or Class Members permitting the disclosure of their protected health information to third parties for such purposes.

172.    Nor did Defendant enter into valid business associate agreements with the third parties receiving the information that would permit such disclosures under HIPAA's regulatory framework.

173.    As a result, Defendant's disclosure of protected health information was not permitted under HIPAA and violated the statute's privacy requirements and the duties of confidentiality owed to Plaintiffs and Class Members.

174.    Defendant's unlawful disclosures of protected health information constitute conduct that is independent of, and in addition to, the interception of electronic communications alleged herein and demonstrate that Defendant's actions were undertaken for unlawful and improper purposes.

175.    Defendant's conduct reflects a systemic practice of transmitting sensitive health-related information to third parties without authorization, thereby undermining the privacy protections that HIPAA is designed to safeguard.

44

176. Defendant continues to employ tracking technologies that result in the ongoing interception and disclosure of protected health information, creating a real and immediate threat of ongoing and future harm to Plaintiffs and Class Members.

177. Plaintiffs and Class Members lack an adequate remedy at law to prevent Defendant's continuing violations and the ongoing unauthorized dissemination of their confidential health information.

178. Plaintiffs do not assert a private right of action under HIPAA. Rather, Plaintiffs rely on HIPAA and its implementing regulations as establishing the standard of care governing Defendant's handling of protected health information and as evidence that Defendant's conduct was unlawful and contrary to established privacy protections.

179. Plaintiffs therefore seek declaratory and injunctive relief prohibiting Defendant from continuing to intercept, disclose, and otherwise misuse Plaintiffs' and Class Members' protected health information, and requiring Defendant to remove or appropriately reconfigure its tracking technologies and practices to comply with applicable federal and state privacy laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in favor of Plaintiffs and the Class and against Defendant, as follows:

A. An Order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representative, and appointing Plaintiffs' counsel as Class Counsel;

B. A declaration that Defendant's conduct, as alleged herein, violates the Electronic Communications Privacy Act, the New Jersey Wiretapping and Electronic Surveillance Control Act, and applicable privacy laws governing the confidentiality of individuals' communications and protected health information;

C. An Order permanently enjoining Defendant from continuing to intercept, collect, transmit, or disclose Plaintiffs' and Class Members' electronic communications and protected health information through the use of tracking technologies without valid authorization;

D. An Order requiring Defendant to remove, disable, or appropriately reconfigure all tracking technologies on its website that result in the interception or disclosure of users' communications or protected health information in violation of law;

E. An Order requiring Defendant to implement and maintain adequate safeguards, policies, and technical controls to ensure that users' communications and protected health information are not intercepted, disclosed, or otherwise misused in violation of federal or state law;

F. An Order requiring Defendant to provide clear, complete, and accurate disclosures to users regarding its data collection, tracking, and sharing practices, including the nature and scope of any disclosures of protected health information to third parties;

G. An award of statutory damages to Plaintiffs and Class Members as provided by law, including under 18 U.S.C. § 2520 and N.J. Stat. § 2A:156A-24;

H. An award of actual, compensatory, and, where appropriate, punitive damages, in an amount to be determined at trial;

46

I.  An award of restitution and disgorgement of all revenues, profits, and other benefits

    obtained by Defendant as a result of its unlawful conduct;

J.  An award of attorneys' fees, costs, and expenses, including expert witness fees, as

    permitted by law;

K.  Pre-judgment and post-judgment interest as permitted by law; and

L.  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Date:   June 19, 2026                         Respectfully submitted,

                                              Gary S. Graifman
                                              Melissa R. Emert*
                                              **KANTROWITZ, GOLDHAMER ,
                                              GRAIFMAN, PERLMUTTER & CARBALLO
                                              P.C.**
                                              135 Chestnut Ridge Road, Suite 200
                                              Montvale, New Jersey 07645
                                              T: 845-356-2570
                                              F: 845-356-4335
                                              memert@kgglaw.com
                                              ggraifman@kgglaw.com

                                              **DON BIVENS PLLC**
                                              Lisa Bivens*
                                              15169 N. Scottsdale Rd, Suite 205
                                              Scottsdale, AZ 85254
                                              Telephone: 602-762-2661
                                              lisa@donbivens.com

                                              *pro hac vice to be filed

                                              Attorneys for the Plaintiffs and the Putative Classes

47